# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KAREN J. HORNELL,        )
                                    )
       Plaintiff,       )
                                    )
       vs.         )     Case number 4:13cv0221 ERW
                                    )                      TCM
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security,   )
                                    )
       Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Karen Hornell (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before undersigned Magistrate Judge for a review and recommended disposition. See 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB and SSI in September 2009, alleging she was disabled as of April 19, 2009, because of problems with her arms, thumbs, hands, and back. (Pl.'s Stat. of

Uncontroverted Mat. Facts (Pl.'s Stat.) ¶ 1[1]; R.[2] at 186.)  Her applications were denied initially and following a May 2011 hearing before Administrative Law Judge (ALJ) Bradley Hanan.  (Pl.'s Stat. ¶ 2-3; R. at 30.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Pl.'s Stat. ¶ 3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Brenda G. Young, M.A., testified at the administrative hearing.  (R. at 42-84.)

Plaintiff was forty-six years old at the time of the hearing.  (Id. at 52.)  She is 5 feet 3 inches tall and weighs 218 pounds.  (Pl.'s Stat. ¶ 45.)  She has gained approximately 60 pounds in the past two years.  (R. at 53.)  She is a widow and lives with her daughter.  (Id.)  She does not have a valid driver's license.  (Id. at 54.)  She started, but did not finish, college.  (Id.)  She has had vocational training in the culinary arts, accounting, basic business, and warehouse quality control and efficiency.  (Id. at 54-55.)  She is a licensed forklift driver.  (Id. at 59.)

Plaintiff last worked full-time in 2009 as a warranty specialist for Convergys, answering the telephone and helping callers repair their phones or, if the phones could not

---

[1]Pursuant to the Case Management Order, Plaintiff submitted with her brief a supporting statement of uncontroverted material facts.  In turn, the Commissioner submitted a response to Plaintiff's statement and a statement of additional material facts.  Either party's statement will be cited only when admitted by the opposing party or supported by the record.

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

be repaired, processing a warrantied exchange or helping the callers get a new phone. (<u>Id.</u> at 57.) She was let go from this job when she was unable to complete an eight-hour shift. (<u>Id.</u> at 58.) She worked in 2008 for a company running molding machines, training people to run the machines, and doing quality control, shipping, receiving, and packing. (<u>Id.</u>) She left this job for the better pay, hours, and insurance at Convergys and because she was having problems doing the necessary lifting. (<u>Id.</u> at 59.) In 2007 and earlier, she worked for WellPoint Companies. (<u>Id.</u> at 60.) She started in the mail service center and was later transferred to the warehouse. (<u>Id.</u>) She left when her job was transferred to the Philippines. (<u>Id.</u>)

After Convergys, she attempted to work part-time at Six Flags. (<u>Id.</u> at 55.) This job ended when she "went off" on a co-worker and was asked to get a doctor's release before returning to work. (<u>Id.</u> at 68.)

Plaintiff testified that she cannot physically or emotionally perform her prior jobs. (Pl.'s Stat. ¶ 45.) She cannot sit for longer than half an hour due to back spasms. (<u>Id.</u>) Even talking exhausts her; walking from her bedroom to her kitchen makes her feel drained. (<u>Id.</u>) Standing causes her hip pain and to shake. (<u>Id.</u>) If she bends over, her left hip can lock up for one to three hours. (<u>Id.</u>) She cannot lift more than five pounds. (<u>Id.</u>) She cannot thread a needle on her sewing machine because she cannot grip the thread, cannot wash her own hair because she cannot use her hands above her head for a sufficient period of time, and cannot grip anything with her left hand. (R. at 66-67.) She cannot tie her shoes or hook her bra. (<u>Id.</u> at 74.) She has difficulties buttoning her clothes. (<u>Id.</u>)

Plaintiff sleeps only two to three hours a day "because her mind won't stop." (Id. at 72.)  She has to force herself to sleep.  (Id.)  She only naps during the day if she has tried to do something.  (Id. at 73.)  She does not prepare meals or do household chores.  (Id.)  She spends most of the day in her room, reading and watching movies.  (Id. at 74.)

Plaintiff wears a spinal brace.  (Pl.'s Stat. ¶ 45.)  She is seeing a psychiatrist and a mental health counselor.  (Id.)  She is compliant with her medications.  (Id.)

Plaintiff further "testified that she gets upset with herself because of her limitations, and then lashes out at other people."  (Id.)

The ALJ asked Ms. Young[3] to assume a claimant of Plaintiff's age, education, and work experience who is "limited to work within a most light exertional category" and who is unable to operate any foot controls and to climb ladders, ropes, or scaffolds.  (R. at 77.)  This claimant can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs.  (Id.)  She has to avoid concentrated exposure to irritants, e.g., fumes, dusts, and gases, and "all exposure to operation control moving machinery, working at unprotected heights, and the use of any hazardous machinery."  (Id. at 77-78.)  She is limited to operations involving only simple, routine, repetitive tasks in a low-stress environment, with only occasional decision-making required, only occasionally changes in the work setting, no interaction with the public, and only occasional interaction with co-workers.  (Id. at 78.)  There can be no tandem tasks.  (Id.)  Ms. Young testified that such a claimant can not perform any of Plaintiff's past relevant work, but can work as a file clerk or small products assembler.  (Id.)  This claimant

---

[3]There was no objection to Ms. Young testifying as a vocational expert.

can also perform some "light cleaning types of jobs."  (Id. at 79.)  If this claimant also requires a sit/stand option every hour and can have only casual and infrequent contact with co-workers, the light assembly jobs and housekeeping jobs are eliminated.  (Id. at 80, 81.)

If this claimant also is limited to only occasional fine manipulation of items no smaller than the size of a paperclip, there are no jobs she can perform.  (Pl.'s Stat. ¶ 46.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments of her physical and mental abilities.

On a Function Report, Plaintiff reported that it sometimes takes her thirty to forty minutes to get out of bed.  (Id. at 196)  She has a cup of tea, lets the dogs out, and sits down until the dogs want to come back in.  (Id.)  She tries to go outside once a day, even if only to sit on the porch.  (Id.)  She tries to sit in the living room; if her pain is bad, she lies down. (Id.)  Because of her tremors, she does not drive.  (Id. at 199.)  Her impairments adversely affect her abilities to lift, bend, reach, sit, climb stairs, squat, kneel, stand, walk, complete tasks, use her hands, and get along with others.  (Id. at 201.)  They sometimes adversely affect her abilities to hear, remember, and understand.  (Id.)  She cannot walk farther than ten to fifty feet.  (Id.)  She gets along fine with authority figures.  (Id. at 202.)

On a disability questionnaire, Plaintiff reported that she can no longer afford physical therapy because she does not have insurance.  (Pl.'s Stat. ¶ 44.)  She has crying spells two to five times a day.  (Id.)  She also is in constant pain, which is worse with movement, and has

difficulty breathing, chest pain, thoughts of suicide, and feelings of hopelessness, inadequacy, worthlessness, anger, anxiety, and stress. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications. (R. at 226-30.) She did not have any new impairments or any new limitations as a result of her current impairments. (Id. at 226.) Also, there was no change, for better or worse, in her impairments. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in August 2006 when Plaintiff saw Connor Andreano-Young, A.P.R.N. (Advanced Practice Registered Nurse), for an initial visit. (Id. at 323-24.) She complained of migraine headaches and "some anxiety." (Id. at 323.) She was diagnosed with depression with anxiety and prescribed Lexapro.[4] (Id. at 323-24.) She was to return in one year or as needed. (Id. at 324.)

She returned in two weeks for a well woman exam. (Id. at 325.) Her diagnoses was hypertension, for which she had not taken any medication in two to five years, and low abdominal pain. (Id. at 325.) She was prescribed Atenolol (for hypertension[5]) to be taken for the next thirty days. (Id. at 326.)

In October 2008, Plaintiff went to the emergency room at St. Anthony's Medical Center (St. Anthony's) for complaints of upper and lower abdominal pain and nausea. (Id. at 266-81.) With the exception of "a very small right renal cortical cyst," the computed

---

[4]Lexapro (escitalopram) is prescribed for the treatment of major depressive disorder or generalized anxiety disorder. Physicians' Desk Reference, 1130-31 (65th ed. 2011) (PDR).

[5]See Atenolol, http://www.drugs.com/monograph/atenolol.html (last visited Feb. 3, 2014).

tomography (CT) scan of her abdomen and pelvis was normal.  (Id. at 278-79.)  Plaintiff returned the next month for complaints of chest pain.  (Pl.'s Stat. ¶ 7.)  Her symptoms included nausea, weakness/fatigue, palpitations, and pain on exertion.  (Id.)  A CT scan of her chest revealed "'dilated main pulmonary artery, suspicious for pulmonary hypertension.'" (Id.)

In March 2009, Plaintiff saw Renee Willer, A.P.R.N., for complaints of sharp chest pain.  (R. at 327.)  Currently, her chest pain was mild. (Id.)  Plaintiff explained that she had stopped taking Atenolol because she was bruising easily.  (Id.)  She was diagnosed with gastroesophageal reflux disease (GERD), chest pain, and hypertension.  (Id.)  Atenolol and Zantac were prescribed.  (Id.)  Three weeks later, Plaintiff complained of constant chest pain that was sometimes sharp.  (Id. at 328.)  When it was sharp, she would get sweaty and shake. (Id.)  On examination, she appeared well and was in no acute distress.  (Id.)  Her heart had a regular rate and rhythm.  (Id.)  She was diagnosed with headaches and migraines, hypertension, depression, not otherwise specified, generalized anxiety disorder, arthritis, and chondritis (inflammation of cartilage[6]).  (Id.)  She was prescribed levothyroxine[7] and ibuprofen.  (Id.)  She was to return for an electrocardiogram.  (Id.)

Plaintiff saw Ms. Willer again on April 2, complaining of a sore throat for the past two days, a frequent cough, and chest heaviness and pressure.  (Id. at 329.)  She had babysat her

---

[6]Stedman's Medical Dictionary, 331 (26th ed. 1995).

[7]Levothyroxine is prescribed for the treatment of hypothyroidism, "a condition where the thyroid gland does not produce enough thyroid hormone."  Levothyroxine, http://www.drugs.com/cons/levothyroxine.html (last visited Feb. 3, 2014).

grandchildren, who had had strep throat. (Id.) Plaintiff was diagnosed with it also and prescribed an antibiotic and allergy medication. (Id.)

On April 20, Plaintiff returned to St. Anthony's emergency room for complaints of chest pain, back pain, hand problems, and blurred vision. (Pl.'s Stat. ¶ 11.) A CT scan of her chest showed no evidence of a pulmonary embolism and revealed right axillary lymphadenopathy. (R. at 309.) Plaintiff was prescribed Nexium.[8] (Id. at 300.)

Two days later, Plaintiff saw Dwayne Helton, D.O., for complaints of right wrist pain, tingling, and weakness for approximately one year and of an inability to hold anything for the past week. (Id. at 330.) If she touched her thumbs, pain shot all the way up to her shoulders. (Id.) Her upper back was locking up. (Id.) Her chest was painful; her legs were going numb. (Id.) On examination, Plaintiff had mild tenderness and tissue texture change in her spine. (Id.) It was recommended she have a magnetic resonance imaging (MRI) of her brain, a nerve conduction study, an electromyogram (EMG), and x-rays of her cervical, thoracic, spine. (Id.) She was diagnosed with peripheral neuropathy and myalgia and prescribed baclofen, a muscle relaxant,[9] and gabapentin, an anticonvulsant.[10] (Id.) She was to return after the studies were done. (Id.)

The MRI revealed a suspected right maxillary sinusitis with inflammatory changes in the right mastoid air cell. (Id. at 359.) The physician, Hilton Price, M.D., characterized the

---

[8]Nexium is prescribed for the treatment of GERD. PDR at 695.

[9]See Baclofen, http://www.drugs.com/baclofen.html (last visited Feb. 3, 2014).

[10]See Gabapentin, http://www.drugs.com/gabapentin.html (last visited Feb. 3, 2014).

MRI as normal.  (Id.)  The x-rays of her lumbar spine revealed mild levoscoliosis; x-rays of her thoracic spine were unremarkable; x-rays of her cervical spine revealed a large bilateral C7 transverse process, mild cervical spondylosis at C6-7, and a loss of normal cervical lordosis.[11]  (R. at 317-19.)

The electrodiagnostic evaluation was performed on April 27 by Lizette Alvarez, M.D. (Id. at 259-60.)  She described Plaintiff as being "a very pleasant woman in no acute distress."  (Id. at 259.)  Plaintiff complained of pain that radiated from her back to her legs, right arm, and right fingers.  (Id.)  Her symptoms had started the week before when her right leg gave way at work.  (Id.)  She also had a choking sensation, which she attributed to having had a panic attack.  (Id.)  Her past medical history included hypertension, irregular heart rate, osteoarthritis, and myocardial infarction.  (Id.)  On examination, she had no ankle edema and her range of motion was within functional limits.  (Id.)  "She had generalized tenderness with palpation throughout."  (Id.)  Her strength was difficult to assess because of her pain.  (Id.)  Her sensation was intact to light touch; her reflexes in her upper and lower extremities were one.  (Id.)  The nerve conduction studies and electrodiagnostic studies were normal.  (Id. at 259-60.)  There was no evidence to suggest a generalized peripheral neuropathy, a focal tibial neuropathy at the ankle or a focal peroneal neuropathy at the ankle or fibular head, or a left focal median neuropathy at the wrist or a left focal ulnar neuropathy at the wrist or at thee elbow.  (Id. at 260.)  There was no evidence of a myopathic process.  (Id.)

_____

[11]These x-rays were performed in May 2009.

The same day, Plaintiff saw Ms. Willer for follow-up on paperwork for the Family Medical Leave Act (FMLA). (Id. at 331.) On examination, her heart was regular in rate and rhythm; her respirations were even and not labored. (Id.)

Plaintiff returned to Dr. Helton on May 1. (Id. at 332.) He noted she had not had the x-rays done yet.[12] (Id.) She reported the last time she had her current symptoms of extremity pain and paresthesia, she had had a fatty tumor removed from her back. (Id.) She reported she lies on the floor in so much pain at work that she vomits. (Id.) She trembles in her chair with pain. (Id.) Dr. Helton described her as "[c]ursing and talking rapidly, all in complaint about her pain and her employers and their FMLA/non-FMLA." (Id.) He diagnosed her with myalgia, arthralgias, and peripheral neuropathy. (Id.) She was prescribed gabapentin and a Medrol dosepack. (Id.)

Plaintiff was taken by ambulance on May 7 to SSM St. Clare Health Center (St. Clare) after experiencing a seizure when at work at Six Flags. (Id. at 402-35.) When the emergency medical technicians arrived, Plaintiff was "lying on the floor incoherent, shaking of arms and legs and screaming in pain everywhere they touched her." (Id. at 402.) At the hospital, she reported she had a similar episodes and had been under a lot of stress. (Id.) On examination, she was alert, awake, and oriented to time, place, and person. (Id.) She had normal muscle bulk, tone, and strength, and no abnormal movements. (Id. at 402-03.) Her deep tendon reflexes were 2+ bilateral symmetrically. (Id. at 403.) A CT scan of her head was negative; a chest x-ray showed no acute disease. (Id. at 403, 460-61.) The impression of the

---

[12]See note 11, supra.

consulting physician, Sherry X. Ma, M.D., was of "[p]resumed seizure with a history of seizure." (Id. at 403.) The attending physician, Paulgun Sulur, M.D., described Plaintiff as being "a rather poor historian." (Id. at 404.) None of her previous seizures had been witnessed. (Id.) She had an anxious affect on exam. (Id.) Her home medications included Albuterol (Combivent and Proventil), both inhalers; aspirin; baclofen; dextromethorphan (Mucinex); and ranitidine (Zantac). (Id.) Dr. Ma recommended she be restarted on Depakote.[13] (Id. at 403.) Plaintiff was discharged the next day with prescriptions for Depakote and ciprofloxacin, an antibiotic. (Id. at 405.)

Plaintiff saw Dr. Helton again on May 15, complaining of continuing back pain. (Id. at 334.) She thought her recent episode of back pain might be attributable to her having changed the muffler in her car two weeks earlier. (Id.) Dr. Helton noted that the spinal x-rays were normal with the exception of showing mild scoliosis. (Id.) On examination, Plaintiff appeared to have mild grip strength in her upper extremities. (Id.) Straight leg raises were negative bilaterally. (Id.) She had mild tenderness and tissue texture change in her entire spine. (Id.) He diagnosed her with lumbago and thoracic back pain and prescribed baclofen and Darvocet.[14] (Id.) Plaintiff was to be evaluated for physical therapy and return as needed. (Id.)

---

[13]"Depakote is used to treat various types of seizure disorders." Depakote, http://www.drugs.com/depakote.html (last visited Feb. 3, 2014).

[14]Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever. See Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited Feb. 3, 2014). It was withdrawn from the United States market in November 2010. Id.

Plaintiff underwent physical therapy in May and June, keeping four appointments and cancelling four. (Id. at 364-79.) The ranges of motion in her in her back and upper and lower extremities had not improved. (Id. at 364.) She was discharged from therapy on June 26 for non-compliance with attendance and lack of progress. (Id. at 365.) United Healthcare was listed as the payor. (Id. at 364.)

After the last physical therapy appointment she kept, Plaintiff reported to Dr. Helton on June 10 that physical therapy was helping her back pain, but she was continuing to have pain in her hands and arms, the latter being localized in her thumbs and mid-forearm. (Id.) Her feet were still painful. (Id.) She could not take ibuprofen because it upset her stomach. (Id.) She was assessed as having pain in her hands, feet, and ankle and was to continue taking baclofen and Darvocet. (Id.) He noted she did not need refills. (Id.)

Three months later, Plaintiff was seen in the St. Clare emergency room in the evening of August 7 for "multiple complaints," including chronic back pain and headaches. (Id. at 438-51.) The current episode of back pain had occurred at work twelve to twenty-four hours earlier. (Id. at 439.) The pain was aching and severe, was aggravated by movement and bending, and was relieved by nothing. (Id.) "There ha[d] been headaches, leg pain, paresthesia, tingling and weakness." (Id.) There had not been any chest pain. (Id.) Plaintiff had taken nothing for her symptoms. (Id.) The attending physician, Justin Moody, D.O., noted as a caveat that Plaintiff "had disjointed though [sic] process, has multiple complaints, tangential thinking, and must constantly be redirected to her chief complaint, which changes often." (Id.) On examination, she was positive for musculoskeletal pain, tingling, weakness,

and headache and exhibited tenderness, pain, and spasm in her lumbar spine. (<u>Id.</u> at 440, 441.) She was not in distress, had normal strength and muscle tone, displayed no atrophy or tremor or seizure activity, and had normal coordination and gait. (<u>Id.</u> at 441.) She was alert and oriented to person, place, and time. (<u>Id.</u>) She was cooperative and had a normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory. (<u>Id.</u> at 441, 442.) On her discharge shortly after midnight the next day, a repeat neurologic examination showed no acute deficits. (<u>Id.</u> at 442.) It was noted she had given "no history of activity to suggest seizure and tremors are likely secondary to pain and muscle spasm in back." (<u>Id.</u>) She was diagnosed with palpitations, lumbar sprain and strain, and a lower urinary tract infection. (<u>Id.</u>)

Plaintiff next sought medical attention on January 6, 2011, when she went to the St. Clare emergency room for treatment of a chronic headache that was a seven on a ten-point scale and that radiated to her neck. (<u>Id.</u> at 541-45.) Also, she had run out of seizure medication. (<u>Id.</u> at 541.) She reported she had insomnia. (<u>Id.</u> at 542.) On examination, she was positive for tremors, seizures, and headaches. (<u>Id.</u>) She had a normal range of motion in her back and neck, exhibited no edema or tenderness, and had a normal affect. (<u>Id.</u>) She was alert and oriented to time, place, and person. (<u>Id.</u>) She was diagnosed with migraines and hypertension and discharged in approximately three hours in improved condition. (<u>Id.</u>)

Two days later, Plaintiff saw Osias A. Almiron, M.D., for migraine headaches she had been having for fourteen years. (<u>Id.</u> at 493.) She was alert, coherent, and obese. (<u>Id.</u>) She

had a weak grip.  (Id.)  She was diagnosed with anxiety/depression, obesity, and migraine headaches.  (Id.)

On January 19, Plaintiff consulted Tulika Katyal, M.D., about tremors that had gotten worse since she was started on sertraline the week before.  (Id. at 490-91.)  She had had a seizure two days earlier, and before then had not had a seizure for six months when she was taking Depakote.  (Id. at 490.)  She had been unable to see a neurologist.  (Id.)  On examination, she was alert and oriented to time, place, and person; had no pedal edema or calf tenderness; had a normal range of motion in her back; and had a regular rate and rhythm to her heart.  (Id.)  Her hypertension was uncontrolled.  (Id. at 491.)  Her diagnoses included depression, bipolar compared to schizophrenia.  (Id.)  She was to discontinue the sertraline and restart the Depakote.  (Id.)

One week later, Plaintiff had a mental health evaluation at Comtrea (Community Treatment, Inc.).  (Id. at 480-82.)  "She reported nightmares, anger, violent behavior, difficulty sleeping, loss of appetite, suicidal thoughts, difficulty concentrating, crying spells, anxiety, panic and isolation, among other symptoms."  (Pl.'s Stat. ¶ 28.)  "A mental status screen noted poor hygiene, depressed mood and affect, suicidal thoughts, hearing voices, and poor self-concept, among other things."  (Id.)  Her diagnosis was psychotic disorder, not otherwise specified, and alcohol dependence, in remission.  (R. at 482.)  Her current Global Assessment of Functioning (GAF) score was 50,[15] as it had been in the past year.  (Id.)

_____

[15]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734,

Plaintiff saw Dr. Almiron again on February 2. (<u>Id.</u> at 492, 494-97.) He advised she see a neurologist as soon as possible and continue her medications. (<u>Id.</u> at 492.)

Plaintiff returned to Comtrea for treatment on February 7. (Pl.'s Stat. ¶ 30.) She reported having episodes of verbal and physical aggression, experiencing stress and anxiety with tremors and seizures, depression, and poor sleep, "among other things." (<u>Id.</u>; R. at 472.) She also reported she had never been hospitalized for psychiatric reasons and had no history of suicide attempts. (Def.'s Stat. ¶ 9.) "Mental status examination revealed tense, dramatic, upset and sad facial expressions, depressed mood and affect, and fair to poor insight and judgment, among other things." (Pl.'s Stat. ¶ 30.) She was diagnosed with major depressive disorder, severe, and anxiety disorder. (<u>Id.</u>) Again, her GAF was 50. (<u>Id.</u>)

Plaintiff saw Dr. Katyal the next day. (<u>Id.</u> at 489.) He noted her hypertension was better controlled on metoprolol, her seizures had improved on the Depakote, her tremors had improved after she stopped taking sertraline, and her hyperlipidemnia was stable on levastatin. (<u>Id.</u>) He advised her not to lift anything heavier than five pounds because of problems she was having with her left hand. (<u>Id.</u>)

Plaintiff was seen at the St. Clare emergency room on March 15 for a migraine headache. (<u>Id.</u> at 546-52.) The migraine had begun one hour earlier. (<u>Id.</u> at 547.) She described the pain as sharp and an eight on a ten-point scale. (<u>Id.</u> at 547.) She reported that her last migraine was two weeks earlier and her last seizure was over three weeks earlier.

---

737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." <u>DSM-IV-TR</u> at 34 (emphasis omitted).

(Id.)  She had not tried anything for the symptoms.  (Id.)  She had a normal range of motion and normal mood, memory, affect, and judgment.  (Id. at 550.)  The physician's impression was migraines.  (Id.)

On April 4, on Dr. Almiron's referral, Plaintiff underwent a neurological evaluation by William R. Logan, M.D.  (Id. at 508-09.)  Plaintiff reported she had begun "to have stress seizures and tremors in mid 1990s."  (Id. at 508.)  His review of her symptoms revealed headaches, seizures, blurred vision, dizziness, ringing in ears, irregular heartbeat, chest pain, swelling of her feet and legs, and "weight gain etc." (Id.)  She seemed anxious.  (Id. at 509.)  Dr. Logan was uncertain whether her spells of the past fifteen years were seizures and opined that they "may simply be a manifestation of anxiety."  (Id.)  He questioned whether a different anticonvulsant medication might be useful.  (Id.)  Plaintiff was to have an electroencephalogram (EEG) and an EMG to determine whether she had any evidence of a polyneuropathy.  (Id.)

The next day, Plaintiff saw Gautam Rohatgi, D.O., a psychiatrist.  (Id. at 513-14.)  She reported having continued depression and anger.  (Id. at 513.)  Her sleep and appetite were fair.  (Id.)  Her grooming and hygiene were appropriate; her speech was fluent and clear; her thought process was linear; her insight and judgment were fair; her thought content was devoid of hallucinations, delusions, and suicidal or homicidal ideation.  (Id.)  She reported her mood was angry.  (Id.)  She was irritable, upset, tearful, and frustrated.  (Id.)  Dr. Rohatgi diagnosed Plaintiff with major depressive disorder, severe, without psychosis, and anxiety

disorder, not otherwise specified.  (Id.)  Her GAF was 50 to 55.[16]  (Id.)  Her dosage of

citalopram[17] was increased.  (Id. at 514.)  She was to continue with supportive therapy, see

pages 19 to 20, infra, and to return in four weeks.  (Id.)

Consequently, Plaintiff saw Dr. Rohatgi again on May 3, reporting decreased crying

and "emotionality" on the increased dose of citalopram.  (Id. at 511-12.)  She was sleeping

only one to two hours and was taking Percocet (a combination of hydrocodone and

acetaminophen[18]).  (Id. at 511.)  On examination, she was calm and relaxed.  (Id.)  Her affect

was tired and sad; her mood was tired.  (Id.)  Otherwise, her mental status was as before.

(Id.)  She walked with a cane.  (Id.)  Her GAF was 55.  (Id.)  The dosage of citalopram was

again increased; Ambien[19] was added.  (Id. at 512.)  She was to return in four weeks.  (Id.)

On May 14, Plaintiff went to the St. Clare emergency room for complaints of a

headache and increasing nausea.  (Id. at 553-60.)  She had not taken anything for her

symptoms.  (Id. at 554.)  A CT scan of her brain showed no acute intracranial findings.  (Id.

at 558.)  The physician's impression was of "[a]ltered mental status"; headache; and nausea.

(Id. at 557.)  A chest x-ray taken five days later revealed no acute cardiopulmonary disease.

---

[16]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34
(emphasis omitted).

[17]Citalopram is an antidepressant.  Citalopram, http://www.drugs.com/citalopram.html (last
visited Feb. 3, 2014).  The record does not indicate when it was first prescribed.

[18]See PDR at 1096.

[19]Ambien is prescribed for the treatment of insomnia.  See Ambien,
http://www.drugs.com/ambien.html (last visited Feb. 3, 2014).

(Id. at 535.)  A CT scan of her chest revealed no evidence of a pulmonary emboli.  (Id. at 536.)

Plaintiff returned to the emergency room on May 26 with complaints of increasing shortness of breath for the past year, chest pain, and a nonproductive cough.  (Id. at 563.) Three days earlier, the chest pain had radiated to her back and right shoulder.  (Id.)  Plaintiff was admitted to the hospital and underwent "an extensive cardiac work up," which was negative.  (Id. at 566.)  A CT scan of her sinuses revealed sinusitis, for which antibiotics were recommended by Sean Bailey, M.D.  (Pl.'s Stat. ¶ 39.)

Plaintiff underwent a sleep study on June 10 to investigate her complaints of snoring, daytime sleepiness, hypnogogic hallucinations, difficulty falling or staying asleep, nocturnal leg discomfort, depression, and chronic pain. (Id. at 538-39.)  She reported she typically slept for one to two hours a night.  (Id. at 538.)  The results of the study indicated intermittent mild to moderate snoring and no evidence of obstructive sleep apnea.  (Id. at 539.)  It was noted she was obese.  (Id.)  She fell asleep within a normal time period but slept for only 4.4 hours with mild sleep fragmentation.  (Id.)

The following month, Plaintiff underwent a pulmonary function test.  (Id. at 606-11.) Her single-breath diffusing capacity (DLCO) was "severely reduced," "most consistent with underlying emphysema." (Id. at 606.)  The impression was of a severe obstructive ventilatory defect" with "a significant response to bronchodilators" and the presence of "mild restriction."  (Id. at 606-07.)

The next week, Plaintiff saw Cesar Munoz, M.D. about her chronic cough and to review the sleep study results. (Id. at 601-05.) He noted she had recently been seen by Dr. Bailey and prescribed additional antibiotics. (Id. at 601.) He also noted she had "multiple" complaints – "difficult to impossible to address all of them in one visit" – in addition to her chronic cough. (Id.) She complained of shortness of breath, but was "chair bound most times." (Id.) She used oxygen at night. (Id.) She was compliant with her medications. (Id.) She reported that her hands, arms, legs, and the side of her feet tingled. (Id. at 603.) Her last seizure had been two weeks earlier. (Id.) She complained of leg edema caused by prednisone, and had trace edema on examination. (Id. at 601, 604.) She was to continue using bronchodilators and inhaled steroids and to return in three months. (Id. at 604.)

In September, Plaintiff was treated by Dr. Bailey for chronic sinusitis. (Id. at 599-600.)

As noted above, the records before the ALJ included those relating to supportive therapy Plaintiff received at Comtrea between February 28, 2011, and June 2, 2011. (Id. at 515-32.) All but two of the thirteen visits were for "psychosocial rehabilitation" and were with Jennifer Eisold, PLPC.[20] (Id.) It was noted at the March 9 visit that Plaintiff's mobility had improved and she was smiling more. (Id. at 531.) She had good and bad days. (Id.) On March 31, she reported she was staying in her room a lot. (Id. at 529.) She cried throughout her April 20 visit. (Id. at 527.) On May 3, it was noted she wore a back brace and used a cane. (Id. at 525.) Her sleep had improved with the use of a hospital bed. (Id.) She had

---

[20]In Missouri, a PLPC is a provisional licensed professional counselor.

been sleeping in one to two hour increments.  (Id.)  The other two visits were with a community support specialist.

Also before the ALJ were assessments of Plaintiff's physical and mental abilities and limitations.

Plaintiff was evaluated in December 2009 by Sarwath Bhattacharya, M.D.  (Id. at 382-88.)  Her complaints were of hypertension, diagnosed in 1989; bronchial asthma, also diagnosed in 1989; hypothyroidism; and bilateral thumb pain.  (Id. at 382-83.)  She became short of breath with exertion.  (Id. at 382.)  The headaches were constant.  (Id.)  She was on inhaler therapy for the asthma and was stable.  (Id. at 383.)  She became short-winded after walking one block or climbing one flight of stairs.  (Id.)  The thumb pain started spontaneously.  (Id.)  X-rays had been negative.  (Id.)  She did most of the housework and watched television.  (Id.)  She did not drive or exercise.  (Id.)  She was 5 feet 2 inches tall and weighed 213 pounds.  (Id. at 384.)  On examination, she appeared in no acute distress.  (Id.)  Her speech and hearing were normal.  (Id.)  "She was overflowing with multiple complaints all at the same time, not relating to any specific condition."  (Id.)  Her lungs were clear to auscultation.  (Id.)  Her gait was waddling; she could walk on her heels and toes and flex to touch her toes.  (Id.)  She held on to the side of the table to squat.  (Id.)  She could get on and off the exam table without difficulty.  (Id.)  Straight leg raises were normal.  (Id.)  She did not have any edema in her extremities.  (Id.)  She was alert and oriented to time, place, and person.  (Id. at 385.)  Deep tendon reflexes were equal.  (Id.)  She had a normal range of motion in her shoulders, elbows, wrists, knees, ankles, hips, and lumbar and cervical spine.

(Id. at 387-88.)  She had full grip strength and normal upper body strength.  (Id.)  Dr. Bhattacharya's impression was of hypertension, for which Plaintiff took medication; bronchial asthma, stable on inhaler therapy; stable hypothyroidism; bilateral thumb pain; and obesity.  (Id. at 385.)

In November 2010, Plaintiff underwent a psychological evaluation by Thomas J. Spencer, Psy.D., for purposes of determining whether she was eligible for Medicaid.  (Id. at 452-55.)  Her physical complaints included "recurrent 'tumors and cysts'"; heart disease, including at least one heart attack; severe migraines; and numbness in her hands and feet. (Id. at 452.)  She reported that her primary care physician, Dr. Helton, had over-prescribed pain killers.  (Id.)  Dr. Spencer described Plaintiff as being "near tears" when she spoke.  (Id.) She "complained that she is 'angry' and prone to blowing up."  (Id.)  She felt "hopeless and helpless."  (Id.)  She reported that, unless she could keep her mind occupied, she cried from when she awoke until when she went to bed.  (Id.)  She had refused inpatient treatment because she had no health insurance.  (Id. at 453.)  Because of her temper, she avoided people. (Id.)  She was forgetful.  (Id.)  She felt "'exhausted' most of the time."  (Id.)  She was not currently taking any prescribed medication and took Depakote she got from friends.  (Id.) She had not seen a physician in over a year.  (Id.)  On examination, she was "mildly unkempt" in appearance.  (Id. at 454.)  She had intermittent eye contact, was generally cooperative, and was hard to keep on task.  (Id.)  She had a tearful and agitated affect.  (Id.) Her voice was "[o]ften loud," leading to repeated requests to keep her voice down.  (Id.)  She walked slowly, with a mild limp, and without assistance.  (Id.)  Her insight and judgment

were questionable.  (Id. at 455.)  Dr. Spencer's impression was of mood disorder, not otherwise specified, and personality disorder, not otherwise specified.  (Id.)  Her GAF was 50 to 55.  (Id.)  He opined that "[b]ased upon the available information," she had a mental illness that interfered with her ability to engage in suitable employment.  (Id.)  The duration could exceed twelve months, "but with appropriate treatment and compliance, prognosis likely improves."  (Id.)

Four months later, in March 2011, Dr. Spencer completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  (Id. at 466-68.)  He assessed Plaintiff as having mild restrictions in her abilities to understand, remember, and carry simple instructions; moderate restrictions in her ability to make judgments on simple work-related decisions; and marked restrictions in her abilities to understand, remember, and carry out complex instructions and to make judgments on complex work-related decisions.  (Id. at 466.)  This assessment was based on Plaintiff's report of her limitations.  (Id.)  She had mild restrictions in her ability to interact appropriately with the public and moderate restrictions in her abilities (a) to interact appropriately with supervisors and co-workers and (b) to respond appropriately to usual work situations and to changes in a routine work setting.  (Id.)  This assessment also was based on Plaintiff's report of her limitations and of her pain.  (Id.)  She could manage her benefits in her own best interest.  (Id. at 468.)

The next month, at Plaintiff's attorney's request, Ms. Eisold completed a Mental Medical Source Statement on Plaintiff's behalf.  (Id. at 504-05.)  She assessed Plaintiff as having a marked limitation in her abilities to function independently, behave in an

- 22 -

emotionally stable manner, relate in social situations, interact with the general public, accept instructions and respond to criticism, maintain socially acceptable behavior, perform at a consistent pace, and work in coordination with others. (<u>Id.</u> at 504-05.) She did not assess Plaintiff's limitations in six other listed abilities. (<u>Id.</u>) She checked "Yes" in response to the questions whether Plaintiff would have these limitations for at least twelve months and whether her medically determinable impairments were cyclical in nature. (<u>Id.</u> at 506.) She did not answer questions about Plaintiff's reliability and punctuality, nor did she identify Plaintiff's onset date of disability. (<u>Id.</u> at 505, 506.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 19, 2009. (Pl. Stat. ¶ 48.) The ALJ next found that Plaintiff had severe impairments of major depressive disorder, degenerative disc disease, obesity, anxiety, personality disorder cluster B traits,[21] and asthma. (R. at 14.) These impairments did not, singly or combined, meet or medically equal an impairment of listing-level severity. (Pl.'s Stat. ¶ 50.)

The ALJ then determined that Plaintiff had the following residual functional capacity (RFC):

> [Plaintiff] has the [RFC] to perform light work as defined in [the regulations] except she is unable to climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; occasionally stoop, kneel, crouch or crawl. She requires

---

[21]According to the [DSM-IV-TR], personality disorders are grouped into three clusters based on their descriptive similarities. DSM-IV-TR at 685. Cluster B personality disorders include Antisocial, Borderline, Histrionic, and Narcissistic Personality Disorders. <u>Id.</u>

a sit/stand option every 60 minutes throughout the eight-hour workday. She is unable to use her lower extremities for foot control operation. She is to avoid concentrated exposure to irritants such as fumes, odors, dust, gases, or poorly ventilated areas and she is to avoid all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery. Furthermore, she is limited to work that involves only simple, routine and repetitive tasks, in a low stress job defined as requiring only occasional decision making and only occasional changes in the work setting with no interaction with the public and only occasional interaction with co-workers, with no tandem tasks assigned to co-workers.

(Id. ¶ 51 (quoting R. at 17) (second and third alterations in original)).

Although Plaintiff's impairments appeared "'troublesome,'" they did not impose any limitations that would preclude employment, nor had any of her treating physicians recommended she not seek employment. (Id. ¶ 52.) Objective tests had been normal. (Id.) There was no "persuasive evidence" her obesity was accompanied by significant degenerative joint disease or degenerative disc disease. (Id.) Although she had told a counselor she did not like people, she testified she "'had no problem talking and talking.'" (Id. (quoting R. at 21)). She had not required psychiatric hospitalization and had not sought consistent treatment. (Id.)

"The ALJ stated that he accorded considerable weight to [Plaintiff's] treating and examining physicians, but stated that none of them indicated [Plaintiff] could not work." (Id. ¶ 53.) Ms. Eisold's statement was not supported by the record. (Id.)

Citing the factors listed in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), and Social Security Rulings 96-4 p and 96-7p, the ALJ then concluded that Plaintiff's statements as to the "intensity, persistence and limiting effects of [her] symptoms are not credible to the extent that they are inconsistent with [his RFC] assessment." (R. at 21-22.) Detracting from

her credibility was the lack of an objective medical basis supporting the severity of her subjective complaints, the lack of any consistent treatment, and the paucity of third party observations corroborating her complaints.  (Id. at 22.)

With her RFC, Plaintiff was unable to perform her past relevant work.  (Pl.'s Stat. ¶ 55.)  She could, however, perform other work as described the vocational expert.  (Id. ¶ 56.) Consequently, she was not disabled as defined in the Act.  (Id. ¶ 57.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R.

§§ 404.1520(a) and 416.920(a)).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical

records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u> **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski</u>, 739 F.2d at 1322).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218).  After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from

that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).

### Discussion

Plaintiff argues that the ALJ erred (1) when determining her RFC because he (a) did not include additional limitations in her abilities to sit, stand, walk, interact with others, and use her hands for fine manipulation and (b) failed to give proper weight to the assessments of Dr. Spencer and Ms. Eisold, and (2) when assessing her credibility.

"Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*." S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted). "[S.S.R. 96-8p] cautions that a failure to make the function-by-function assessment could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1).

An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See also **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record"); **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

Plaintiff argues that the ALJ fatally failed to include in his RFC findings her ability to sit for no longer than thirty minutes, her inability to stand without hip pain and shakes, her inability to walk even as far as the bathroom without feeling drained, and her inability to talk without becoming exhausted. These are all limitations described by Plaintiff when testifying. The ALJ found her testimony not to be entirely credible.

Plaintiff argues that this finding is erroneous.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). And, while an ALJ must acknowledge and consider the Polaski factors, as did the ALJ in the instant case,

the ALJ "'need not explicitly discuss each Polaski factor.'" **Wildman v. Astrue**, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Goff, 421 F.3d at 791); accord **Lowe v. Apfel**, 226 F.3d 969, 971-72 (8th Cir. 2000) (holding that although ALJ was required to make express credibility determinations, he "was not required to methodically discuss each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subject complaints").

When finding Plaintiff not fully credible, the ALJ properly considered the lack of supporting objective evidence. See **Buckner**, 646 F.3d at 558 (affirming the appropriateness of such consideration). Diagnostic studies, e.g., CT scans, MRIs, x-rays, nerve conduction studies, EMGs, and an EEG, consistently failed to reveal any objective evidence supporting Plaintiff's subjective complaints. Moreover, the evidence in the medical records cited by Plaintiff in support of her RFC argument consists of her reports of her symptoms. For instance, Plaintiff cites the diagnoses of "possible seizure activity, history of epilepsy, and probable anxiety" in May when she was discharged from St. Clare the day after being admitted for a "[p]resumed  seizure with a history of seizure." (Pl.'s Br. at 7; R. at 403.) Tests, e.g., a CT scan of her head, and examination findings, e.g., Plaintiff having normal muscle bulk, tone, and strength and no abnormal movements, when hospitalized did not support her claims. Indeed, the admitting physician noted that none of Plaintiff's reported seizures had been witnessed. The admitting and discharge diagnoses were not definitive; rather, they were of potential and possible problems. Plaintiff also cites the reference in Dr. Bhattacharya's notes to her having a waddling gait and needing to hold onto a table when

squatting. Those same notes also describe Plaintiff as being able to walk on her heels and toes, flex to her toes, and get on and off the exam table without difficulty. She had a full grip strength and a normal range of motion in her hips, ankles, and lumbar and cervical spine. Straight leg raises were negative, indicating the lack of physical findings to verify Plaintiff's reports of back pain.[22] See **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009). Another example of an allegedly supportive objective finding is the April 2009 lumbar spine x-ray revealing levoscoliosis and cervical spine x-ray revealing a large bilateral C7 transverse process, cervical spondylosis at C6-7, and a loss of normal cervical lordosis. (Pl.'s Br. at 9.) The levoscoliosis and spondylosis were both described as mild. The cited x-ray findings were described by her treating physician, Dr. Helton, as normal. And, Plaintiff consistently had a normal range of motion in her neck. Plaintiff cites examination findings of tenderness, pain, and spasm in her low back when she was at the St. Clare emergency room in August 2010.[23] The emergency room records further reveal that she complained of seizure activity, but did not have any. She did have, however, normal coordination, gait, muscle tone and strength, affect, mood, judgment, speech, and thought content.

Plaintiff also takes issue with the ALJ's determination that the lack of consistent treatment detracted from her credibility. (Pl.'s Br. at 15.) The record supports a conclusion

---

[22]The Court notes that Plaintiff's straight leg raises were always negative.

[23]Plaintiff characterizes this visit as being from August 7, 2010, through August 8, 2010. This is a generous description. She went to the emergency room the evening of August 7 and was discharged within half an hour after midnight on August 8.

that there is such a lack.  Plaintiff sought medical treatment in April 2006 for depression.  She was to return in one year or as needed.  Other than for a well woman exam, she did not return.  She saw Dr. Helton once in April 2009, twice in May 2009, and once in June 2009.  She was seen at St. Clare once in April 2009, when she was prescribed Depakote; once in August 2009, when it was noted she was not taking any medications for her symptoms; once in January 2011; once in March 2011, when it was again noted she was not taking any medications; and twice in May 2011.  Also in January 2011, she saw Drs. Almiron and Katyal and was seen at Comtrea for a mental health evaluation.  Dr. Katyal noted she was not taking Depakote.  She saw these same three providers the next month.  In April 2011, she saw Dr. Rohatgi.  She saw him again the next month.  In July 2011, she saw Dr. Munoz.  As this outline makes clear, other than the St. Clare emergency room, Plaintiff did not seek treatment from the same provider for any period longer than three months.

Plaintiff argues that the ALJ erred in considering this lack of consistency[24] because she had a good reason – lack of income and insurance – for it.  There is no evidence, however, that Plaintiff "was ever denied medical treatment due to financial reasons.  Without such evidence, [her] failure to [seek such treatment] is relevant to the credibility determination." **Goff**, 421 F.3d at 793.  And, the Court notes that Plaintiff reported on a disability questionnaire that she could not afford physical therapy because she did not have insurance, but the physical therapy records list United Healthcare as the payor.  She informed Dr.

---

[24]The Court notes that a failure to seek regular treatment is not consistent with complaints of a disabling impairment.  See **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007).

Spencer she had refused inpatient treatment because she had no health insurance, but there is no record of such treatment being recommended.

Plaintiff further argues the ALJ erred by not recognizing that a mentally ill claimant's noncompliance may be the result of illness when discounting her credibility based on her lack of treatment. When assessing a claimant's mental impairments, an ALJ may consider, inter alia, the claimant's failure to seek mental treatment. **Partee**, 638 F.3d at 864. See e.g. **Pratt v. Astrue**, 372 Fed. App'x 681, 682 (8th Cir. 2010) (per curiam) (holding that ALJ's credibility finding was supported by, inter alia, lack of mental health treatment); **Brown v. Astrue**, 357 Fed. App'x 729, 730 (8th Cir. 2009) (per curiam) (same); **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (same). On the other hand, a mentally ill person's noncompliance with treatment or medication may be the result of the illness. See **Pate-Fires**, 564 F.3d at 945. There is a difference between being aware of a need to take medication and "the question whether [a claimant's] noncompliance with [his] medication was a medically-determinable symptom of [his] mental illness." **Id.** In **Pate-Fires**, 564 F.3d at 946, the claimant had a lengthy history of mental health treatment, including four involuntary hospitalizations, and of noncompliance with treatment. The record before the ALJ evidenced no inability of Plaintiff to seek mental health treatment – for instance, she was able to consult a psychiatrist the month before and the month of her hearing and to testify at the hearing that she was seeing a psychiatrist – and no consequences, e.g., trips to the emergency room or hospitalizations, when she did not seek it.

When assessing Plaintiff's credibility, the ALJ also properly considered the lack of supporting third-party observations as detracting from that credibility. See **McCoy**, 648 F.3d at 614 (affirming the appropriateness of such consideration).

Because the ALJ's credibility determination is "supported by good reasons and substantial evidence," **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013) (internal quotations omitted), the opinions of Dr. Spencer or Ms. Eisold, both of which relied on her subjective reports, could properly be discounted. See **Renstrom**, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the opinion of a consulting examiner may be given little weight if it is based largely on the subjective complaints of a claimant found not to be credible). See also **McCoy**, 648 F.3d at 617 (holding ALJ did not err in discrediting mental RFC assessment of neurologist that was based, "at least in part, on [claimant's] self-reported symptoms" which had been "found to be less than credible").

Ms. Eisold's opinion may properly be discounted for an additional reason. A licensed professional counselor, provisional or not, is not an acceptable medical source. See 20 C.F.R. §§ 404.1513(a), 416.913(a). And, although the evidence of a provider who is not such a source may be relevant to how a claimant's impairment affects her ability to work, see 20 C.F.R. §§ 404.1513(d), 416.913(d), the opinion of Ms. Eisold is clearly based on Plaintiff's report, as evidenced by Ms. Eisold's consistent reference to her role as being that of an "active

listen[er]," see e.g., R. at 524-30, and by the incompleteness of her medical source statement, indicating she assessed only those limitations of which Plaintiff complained.

Plaintiff further argues the ALJ erred when finding both that her degenerative disc disease and obesity were severe impairments and that her obesity was not accompanied by a significant degenerative joint disease or degenerative disc disease.

The ALJ noted in his decision that Social Security Ruling 02-1p indicates that the effects of "obesity should be considered when evaluating disability since these effects, combined with other impairments, can be greater than the effects of impairments considered separately." (R. at 16.) See S.S.R. 02-01p, 2000 WL 628049, *4 (S.S.A. Sept. 12, 2002) (Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."). See also 20 C.F.R. Pt. 404, Subpart P, Appx. 1, § 1.00(Q) ("[W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.").

In **Myers v. Colvin**, 721 F.3d 521, 527 (8th Cir. 2013), the Eighth Circuit Court of Appeals rejected an argument that the ALJ had erred by failing to consider the claimant's obesity and breathing limitations when determining the claimant's RFC. As in the instant case, the ALJ had included obesity among the claimant's severe impairments. **Id.** at 523. His

RFC determination limited the amount of weight the claimant could lift and the length of time during an eight-hour day when she could stand and walk.  **Id.** at 526.  In **Heino v. Astrue**, 578 F.3d 873, 881 (8th Cir. 2009), the Eighth Circuit recognized its previous holding "that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal."  The court then rejected the claimant's argument that the ALJ had failed to consider her obesity when determining her RFC.  **Id.** See also **Green v. Astrue**, 2011 WL 749743, *20-21 (E.D. Mo. 2011) (finding that ALJ properly considered claimant's obesity by considering all her medical records and symptoms in light of obesity and concluding that impairments did not meet requirements of listing).

In the instant case, the ALJ found Plaintiff's obesity to be a severe impairment, cited Social Security Ruling 02-1p, limited the amount of weight she can lift, limited the frequency of certain exertional activities, e.g., crouching, and required that she have a sit/stand option every sixty minutes during an eight-hour workday.  In the instant case, this is sufficient to avoid reversal.  See **Yarbrough v. Astrue**, 2012 WL 3235747, *3-4 (E.D. Ark. 2012) (finding that ALJ's citation to Social Security Ruling 02-1p, his statement that he had to consider at step three whether the combination of claimant's impairments satisfied a listing, and summary of alleged impairments, including obesity, satisfied requirement that ALJ consider combined effect of impairments, including obesity).

Plaintiff also challenges the ALJ's reasoning that Plaintiff's statement to a counselor she did not like people was inconsistent with her statement she "had no problem talking and talking and talking."  (R. at 21.)  She contends this reasoning ignores the ALJ's own

observation that Plaintiff was "becoming excessively angry during the hearing and using bad language." (Pl.'s Br. at 66.) At one point during the ALJ's questioning of Plaintiff, she described her limitations and said she gets "pissed off" at herself when she cannot do something. (R. at 66.) The ALJ commented she was getting "a *little* angry" and told her to watch the verbiage. (Id. (emphasis added)). Plaintiff apologized and complied. This brief exchange does not negate the ALJ's reasoning. Moreover, any inconsistency between that reasoning and the ALJ's hearing comment is, at worst, harmless. See **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008) (declining to remand case when ALJ's inconsistent findings had no bearing on outcome of claimant's Title II claim).

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  5th  day of February, 2014.